[No. B230446. Second Dist., Div. Five. Mar. 19, 2012.]

In re E.M., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
G.N., Defendant and Appellant.

**COUNSEL**

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai for Plaintiff and Respondent.

**OPINION**

**MOSK, J.—**

## INTRODUCTION

We hold that under the doctrine of disentitlement, mother has forfeited her right to appeal from the juvenile court's orders because she willfully left the jurisdiction with her children while the Welfare and Institutions Code section 300[1] petition was pending and, even though a warrant for her arrest had been recalled, her continued absence from the jurisdiction undermined and frustrated the juvenile court's ability to implement the dependency law procedures intended to protect and benefit the interests of her children. We therefore dismiss the appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 18, 2007, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition under section 300, subdivisions (b) and (d) alleging that the father of children A.M., E.M., and G.M. (father) had been sexually abusing C.G., the daughter of his longtime sexual companion, from the time C.G. was age nine through age 16. According to DCFS, father "repeatedly, forcibly rap[ed] [C.G.] . . . ." DCFS alleged that father "frequently fondled [C.G.'s] breasts, thighs, buttocks and vagina." DCFS further

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

alleged that defendant and appellant G.N., the mother of the three children (mother), "knew of the sexual abuse of [C.G.] but . . . failed to protect [her] children in that the mother allowed . . . father to reside in [her] children's home and have unlimited access to [her] children." DCFS concluded that father's sexual abuse of C.G. and mother's failure to protect her children endangered their physical and emotional health and safety and placed them at risk of "physical and emotional harm, damage, danger, [and] sexual abuse . . . ."

In a May 18, 2007, detention report, DCFS reported that a separate section 300 petition had been sustained against father for sexually abusing his "stepdaughter" C.G. from the age of nine, i.e., for a seven-year period. According to the report, father was currently residing with mother and their three children, A.M., E.M., and J.M. A children's social worker (CSW) interviewed the three children, mother, and father. Each of the children denied that father had abused them. Mother stated that she did not believe father abused C.G. and informed the CSW that C.G. "was stealing from her mother, using drugs, and [was] sexually promiscuous . . . ." Nevertheless, mother agreed that if father needed to leave the children's home, she would "do whatever [was] required of her." Mother also informed the CSW that she was considering taking her children to Mexico, and father could "sort out his problems here." Father told the CSW he did not sexually abuse C.G. and notwithstanding that a petition alleging such sexual abuse had been sustained by the juvenile court, he hoped to prevail on his appeal from the order sustaining that petition. But father agreed to leave the home, enter counseling, and follow the orders of the juvenile court.

In a June 18, 2007, disposition report, a CSW reported that mother admitted she learned about the allegations of father's sexual abuse of C.G. a year earlier in June 2006. Nevertheless, she allowed father to move back into the home for approximately eight months until a CSW came to their home in May 2007 and told father to leave. According to mother, she did not believe C.G.'s allegations that father sexually abused C.G. But when reminded by the CSW that the allegations of sexual abuse against father had been sustained by the juvenile court in the separate case involving C.G., mother acknowledged that it was possible that father had sexually abused C.G. Mother nevertheless denied that father had sexually abused any of her three children. Mother also complained that all the visits by CSW's interrupted the children's lives. As a result, mother was considering returning to her hometown in Mexico with the children.

The CSW who interviewed father reported that he denied sexually abusing C.G., despite the juvenile court's finding that C.G.'s allegations were

true. When asked why he was not attending a sexual abuse perpetrators group as he had agreed, father explained that "it was affecting [him] to hear all [the] things about sexual abuse because [he was] not a perpetrator." He agreed, however, to attend the classes if it would enable him to see his children. According to father, he wanted his three children—A.M., E.M., and J.M.— "to be with [mother] and [him]."

The CSW further reported that on May 15, 2007, DCFS had a meeting to create a safety plan. The entire family attended the meeting. Under the agreed-upon safety plan, the children would be detained from father and left in mother's care, mother would protect the children and not allow father to reside in the home, mother and the children would attend individual therapy to address case issues, mother would enroll in sex abuse awareness and parent education counseling, and father would enroll in sex abuse counseling for perpetrators. The children were released to mother, and father was to have monitored visits with the children in a DCFS office or a neutral setting with a DCFS-approved monitor.

At the June 18, 2007, pretrial conference, both mother and father appeared and were represented by counsel. The juvenile court set the matter for a contested jurisdiction and disposition hearing on June 25, 2007. At the June 25, 2007, hearing, mother and father again appeared and were represented by counsel. The juvenile court continued the matter to August 6, 2007, so that documents from the separate case involving father's sexual abuse of C.G. could be obtained and considered.

On July 30, 2007, DCFS filed a request for protective custody warrants. According to DCFS, mother had checked A.M. and E.M. out of their respective schools on June 21 and 30, 2007. In addition, the manager at the family's apartment complex confirmed that the family moved out of their apartment on June 30, 2007. And, father's employees reported that he told them he was going to Mexico for a vacation for approximately 30 days. On August 2, 2007, the juvenile court issued protective custody warrants for A.M., E.M., and J.M. The juvenile court also issued arrest warrants for mother and father and set bail at $500,000 for each parent.

Over the next two and a half years, the juvenile court held six-month review hearings to determine if there was any new information on the whereabouts of the children and their parents.[2] In a February 24, 2010,

---

[2] At a review hearing on December 31, 2008, the juvenile court dismissed the petition as to A.M. because she had turned 18 years old.

interim review report, DCFS advised the juvenile court that the children were residing with their parents in the State of Sinaloa, Mexico. According to DCFS, based on an address in Mexico it had obtained for mother, DCFS requested DIF[3] in Mexico to initiate an international home study of that location. On January 22, 2010, a CSW followed up with DIF and was informed that the family was residing at the address provided and that during the DIF social worker's first contact with the family, father was in the home, but mother denied father was living there. The DIF social worker reported that the children were attending school and were being provided with basic necessities and a stable home. DCFS advised the juvenile court of its concern about father living in the home and that it was uncertain whether mother was participating in the required therapy and counseling. DCFS requested "courtesy" supervision of the family by DIF based on DCFS's belief that father was in continuous contact with mother and the children.

At a February 24, 2010, hearing, the juvenile court set a contested jurisdiction and disposition hearing for August 16, 2010. The juvenile court ordered DCFS to give notice of that hearing date to the family in Mexico pursuant to the Hague Service Convention.[4] (Code Civ. Proc., § 413.10, subd. (c).) On June 23, 2010, the juvenile court continued the contested jurisdiction and disposition hearing to December 16, 2010, and set August 16, 2010, as the date on which DCFS was to submit proof of service of the Hague Service Convention notices.

On August 16, 2010, a CSW reported that DIF continued to provide courtesy supervision and services for the family. Mother and the children were receiving individual therapy. The CSW had requested a progress report from the therapist. The CSW did not know whether the children were having contact with father who lived in Veracruz, but mother claimed she was not having any contact with him. The CSW also explained that the man who identified himself as father during the first home visit by the DIF social worker was mother's brother who told the social worker he was the children's father to prevent them from being removed from the home. At the August 16, 2010, hearing, the juvenile court found that notice of the December 16, 2010, jurisdiction and disposition hearing had been made and continued the matter for hearing on that date.

---

[3] DIF is the acronym for Desarrollo Integral de la Familia, a Mexican social services agency dealing with family matters. (See *In re Jennifer O.* (2010) 184 Cal.App.4th 539, 543, fn. 6 [108 Cal.Rptr.3d 846].)

[4] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, article 10 (Nov. 15, 1965) 20 U.S.T. 361, T.I.A.S. No. 6638.

In a December 16, 2010, last minute information for the court, a CSW reported that mother and the children had received notice of the combined hearing on jurisdiction and disposition through the Mexican Ministry of Foreign Affairs. Although the CSW had requested progress reports from the DIF social worker, none had been forthcoming.

At the December 16, 2010, hearing, mother and the children did not appear, but they were represented by counsel. The juvenile court admitted DCFS's documentary evidence and took judicial notice of the findings and orders of the court in the separate dependency case involving the sexual abuse of C.G., as well as father's voluntary dismissal of his appeal in that case. Following argument, the juvenile court found that notice was proper and sustained as true the allegations of risk of sexual abuse of the children and failure to protect them. The juvenile court declared E.M. and J.M. dependents of the court, ordered that they remain in mother's custody, and ordered that mother was to receive family maintenance services. Mother was also ordered to participate in parenting classes and sexual abuse awareness counseling. The juvenile court further ordered DCFS to obtain written reports from DIF and service providers in Mexico. Thereafter, the protective custody warrants for the children and the arrest warrants for mother and father were recalled by the juvenile court. Mother timely appealed from the December 16, 2010, jurisdiction and disposition orders.

In a June 16, 2011, status review report, a CSW reported that she had monthly contact with mother through letters and e-mails. The CSW also reported that she had not received progress reports on the family's compliance with the juvenile court's orders and the current status of the children. As a result, DCFS was unable to "assess the children's and the mother's progress in the Court-ordered programs." DCFS therefore recommended that E.M. and J.M. remain dependents of the juvenile court and that DCFS be ordered to continue to provide mother and the children with family maintenance services. In a supplemental report, DCFS detailed the efforts made by its CSW to communicate with the DIF social worker. DCFS had received one reply from the DIF social worker indicating that she had not received a report from the psychologist, but that mother and the children were attending therapy. DCFS had not been provided a telephone number for mother, and could only communicate with her in writing.

At the June 16, 2011, review hearing, mother's counsel asserted that the juvenile court lacked subject matter jurisdiction over mother and requested that the case be dismissed. DCFS argued that there was insufficient evidence of compliance with the court-ordered case plan and that jurisdiction should

continue. The children's counsel informed the juvenile court that she had been unable to contact the children and therefore she was "not sure what [was] going on." The juvenile court found that continued jurisdiction was necessary, directed the children's counsel to establish communication with them, and set the matter for a three-month review hearing. Mother thereafter appealed from the juvenile court's order continuing jurisdiction.[5]

## DISCUSSION

### A. *Doctrine of Disentitlement*

DCFS contends that mother is barred from pursuing her appeal under the well-established doctrine of disentitlement, a doctrine by which an appellate court may stay or dismiss an appeal by a party who has refused to obey the superior court's legal orders. (*Say & Say v. Castellano* (1994) 22 Cal.App.4th 88, 94 [27 Cal.Rptr.2d 270].) "Dismissal is not ' "a penalty imposed as a punishment for criminal contempt. It is an exercise of a state court's inherent power to use its processes to induce compliance" ' with a presumptively valid order. [Citation.]" (*Ibid.*) Thus, the disentitlement doctrine prevents a party from seeking assistance from the court while that party is in "an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277 [89 P.2d 382] [the appellant challenged attorney fees and costs after absconding with the minor children and holding them outside the country].)

Appellate disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction . . . ." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897 [106 Cal.Rptr.3d 365].) In criminal cases, it is often applied when the appellant is a fugitive from justice. (*Ibid.*) In dependency cases, the doctrine has been applied only in cases of the most egregious conduct by the appellant, which frustrates the purpose of dependency law and makes it impossible to protect the child or act in the child's best interests. (*In re C.C.* (2003) 111 Cal.App.4th 76, 84 [3 Cal.Rptr.3d 354] [refusal to submit to a psychological evaluation]; *In re Kamelia S.* (2000) 82 Cal.App.4th 1224, 1229 [98 Cal.Rptr.2d 816] [father absconded with minor]; *Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293, 1299 [118 Cal.Rptr.2d 42] [grandparents—denied placement and guardianship—absconded with minor]; *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617, 623–624 [30 Cal.Rptr.2d 591] [mother abducted child].)

---

[5] We granted mother's motion to consolidate the two appeals, as they raise identical factual and legal issues. Father did not appeal.

In the dependency context, the disentitlement doctrine has been applied to conduct other than the abduction of children. For example, in *In re C.C., supra,* 111 Cal.App.4th 76, the court held that because the mother refused to comply with a court-ordered psychological evaluation she was disentitled to reunification services. In explaining the application of the disentitlement doctrine to the facts before it, the court observed that, in addition to abduction cases, the doctrine applies to "other kinds of conduct [in dependency proceedings]. In particular, it extends to conduct that . . . frustrates the ability of another party to obtain information it needs to protect its own legal rights. In *TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377 [83 Cal.Rptr.2d 834], judgment debtors refused to comply with a court order to answer postjudgment interrogatories designed to secure information to aid in enforcement of the money judgment against them. The court dismissed their appeal from the judgment, holding it had the inherent power to do so without a judgment of contempt. (*Id.* at pp. 379–380.)" (*Id.* at p. 85.)

The court in *In re C.C., supra,* 111 Cal.App.4th 76 concluded that the mother's refusal to participate in the court-ordered psychological evaluation barred her right to reunification services. "[The m]other's conduct makes it impossible for the court to perform its obligation to determine, pursuant to section 361.5(b)(2), whether her mental disability renders her incapable of utilizing reunification services. [The m]other's conduct also interferes with the legal rights of [the m]inor. . . . [The m]other, like the offending father in *Kamelia S.,* is 'entirely responsible for paralyzing the court's ability to implement the procedures intended to benefit the interests of the dependent minor.' (*In re Kamelia S., supra,* 82 Cal.App.4th at p. 1229.)" (*Id.* at p. 85.)

### B. *Analysis*

In this case, a juvenile court in a separate dependency proceeding found that father had sexually abused C.G. for seven years, a finding that became final when father dismissed his appeal in that separate proceeding. Despite her knowledge of that serious finding of sexual abuse, mother allowed father to continue to live with her children and, after the petition in this case was filed, she denied that father had abused C.G., claiming C.G. was making false accusations about father and threatening to remove the children to Mexico. Faced with the pending proceedings in this case, mother attended a meeting with DCFS and voluntarily agreed to comply with a case plan that required her, inter alia, to complete a sexual abuse awareness class and required her and the children to participate in individual therapy. Thereafter, mother attended a pretrial conference and an adjudication hearing which was continued to obtain documents from the dependency proceeding involving father

and C.G. Within days of that adjudication hearing, however, mother—without notice to the juvenile court or DCFS—fled to Mexico with the children at the same time father fled there, causing the juvenile court to issue arrest warrants for the parents and protective custody warrants for the children.

By absconding to Mexico with the children, mother effectively undermined and frustrated the core purpose of California's dependency law—to protect and benefit the interests of children who are the subject of a section 300 petition. For over two years, mother successfully avoided any supervision or oversight by either the juvenile court or DCFS. As a direct result, the juvenile court was unable during that time to enforce its orders and extend its protection to the children. Even after mother was located, DCFS was unable to assess whether mother was in compliance with the case plan. In particular, neither DCFS nor the juvenile court had confirmation that mother had successfully completed the court-ordered parenting classes and sexual abuse awareness program or that mother and the children had completed the court-ordered individual therapy because, inter alia, there were no written reports from the therapist and the children's attorney had been unable to contact them. In addition, although mother denied having contact with father, it is unclear from the available information whether he was having contact with E.M. and J.M. If he was having such contact, the circumstances and extent of that contact were unclear. Therefore, the juvenile court was also unable to ensure that mother was complying with its order that father was to have only monitored visits with the children and that mother was not to act as monitor for those visits.

Mother argues that because the trial court recalled the arrest warrant for her after it issued the jurisdiction and disposition orders and she is not in violation of any orders during the pendency of the appeal, the disentitlement doctrine does not apply. She relies on language in cases such as *Guardianship of Melissa W., supra*, 96 Cal.App.4th at page 1296, in which the court said that parties "may not obtain review of the judgment while at the same time being in violation of the very judgment from which they appeal."

But in other cases, such as *In re Claudia S.* (2005) 131 Cal.App.4th 236, 244 [31 Cal.Rptr.3d 697], the disentitlement doctrine has been described in more general terms: "A reviewing court has the inherent power to dismiss an appeal by any party who has refused to comply with trial court orders. (*TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377, 379 [83 Cal.Rptr.2d 834].) The disentitlement doctrine is based on the equitable notion that a party to an action cannot seek the assistance of a court while the party 'stands in an attitude of contempt to legal orders and processes of the courts of this state.

[Citations.]' (*MacPherson v. MacPherson*[, *supra,*] 13 Cal.2d 271, 277 [89 P.2d 382].) A formal judgment of contempt, however, is not a prerequisite to exercising [an appellate court's] power to dismiss; rather, we may dismiss an appeal where there has been *willful disobedience or obstructive tactics*. (*Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683 [34 Cal.Rptr.2d 244].)" (Italics added.)

This broader formulation of the doctrine suggests that it is not limited to cases in which the appellant is in violation of the order from which he or she appeals, but rather may also apply to cases in which the appellant has violated orders other than the one from which the appeal has been taken. For example, in *TMS, Inc. v. Aihara, supra*, 71 Cal.App.4th 377, the court dismissed an appeal from a judgment based on the appellants' violation of a separate postjudgment order requiring them to answer postjudgment interrogatories. (*Id.* at pp. 379–380.) Similarly, in *Stone v. Bach* (1978) 80 Cal.App.3d 442 [145 Cal.Rptr. 599], the court, pursuant to the disentitlement doctrine, dismissed an appeal from a judgment dissolving a partnership. The stay was based on, inter alia, the appellant's violation of a pretrial order requiring deposit of partnership monies into a trustee account and the appellant's postjudgment refusal to be sworn as a judgment debtor. (*Id.* at p. 448.) In *Tobin v. Casaus* (1954) 128 Cal.App.2d 588 [275 P.2d 792], the court conditionally dismissed, pursuant to the disentitlement doctrine, an appeal from a money judgment because of appellant's postjudgment refusal to appear at a judgment debtor's examination and to surrender in response to an arrest warrant. (*Id.* at p. 592.) Moreover, disentitlement is a doctrine that can apply in the trial courts. (See, e.g., *In re C.C., supra*, 111 Cal.App.4th 76.)

Not every act of noncooperation in the trial court results in disentitlement. In *In re Baby Boy M.* (2006) 141 Cal.App.4th 588, 597–598 [46 Cal.Rptr.3d 196], the court said, "Under the circumstances we decline to expand the disentitlement doctrine to preclude the appeal of a recalcitrant parent, who, despite her initial lack of cooperation, has violated no court order . . . ." The court added that the conduct in that case, although "obstructive," occurred prior to the filing of the dependency petition, and was not "*sufficiently egregious* to deprive [the mother] of her right to challenge the juvenile court's jurisdiction and disposition orders." (*Id.* at p. 597, fn. 6, italics added.)

■ Thus, the disentitlement doctrine is not only applicable to disobedience of the order being appealed; it also applies to "egregious" conduct that frustrates the juvenile court from carrying out its orders. In any event, mother's conduct supporting disentitlement does bear directly on the orders

being appealed. Even though the juvenile court recalled the warrant for mother's arrest, her continuing absence with the children from the jurisdiction has prevented the juvenile court from ensuring that she is in compliance with its legal orders and processes—including those that are the subject of this appeal. After voluntarily agreeing to comply with the juvenile court's orders and case plan, mother willfully left the jurisdiction and had no contact with DCFS or the juvenile court for over two years, conduct that undermined and frustrated the purpose of the dependency law. During that extended period of time, the court could not protect the children from the risk of sexual abuse posed by father and from mother's demonstrated unwillingness to shield them from that risk. Similarly, the juvenile court was prevented from acting in the children's best interests by ensuring compliance with court-ordered therapy, parenting, and sexual abuse awareness programs.

Even after DCFS located mother and the children, she did not affirmatively demonstrate that she was in full compliance with the case plan. To the contrary, mother appeared to use her residency in Mexico as a means to avoid direct supervision by DCFS and full compliance with her case plan. In addition to mother and the children being completely unavailable by telephone, mother limited direct communication with DCFS to monthly letters or e-mails, conduct that contributed to DCFS's inability to assess the progress of the children and mother in the court-ordered programs. Because mother was solely responsible for the juvenile court's inability to implement fully the procedures intended to protect the children and benefit their interests, she forfeited her right to challenge the orders from which she appeals.

Unlike the parents in *In re Claudia S., supra*, 131 Cal.App.4th 236, who took the children to Mexico *before* the filing of a section 300 petition and the entry of any orders by the juvenile court, mother in this case was fully involved in and subject to the dependency proceedings prior to fleeing the jurisdiction, and she apparently understood the potential gravity of those proceedings. She also received notice of the jurisdiction and disposition hearing, but chose not to attend or participate in that proceeding. Under these circumstances, there is an adequate basis for determining that mother's conduct was sufficiently egregious to warrant the application of the doctrine of disentitlement and dismissing both appeals.[6] Because mother is disentitled to appeal, we do not address her contention regarding subject matter jurisdiction. (See Fam. Code, § 3422 [continuing jurisdiction].)[7]

---

[6] Mother concedes that the "two appeals address the exact same legal and factual issues." Thus, the disentitlement doctrine applies with equal force to both appeals.

[7] There is nothing in the record to suggest that any other court has invoked jurisdiction over the subject matter being appealed here.

## DISPOSITION

The appeals from the December 16, 2010, jurisdiction and disposition orders and the June 16, 2011, order continuing jurisdiction are dismissed.

Turner, P. J., and Kriegler, J., concurred.