Filed 1/31/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B282855 (Super. Ct. No. J070951) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. A.N., Defendant and Appellant. | |

A.N. (mother) appeals the juvenile court's order terminating her parental rights to R.H., an Indian child, and selecting adoption as his permanent plan. (Welf. & Inst. Code,[1] § 366.26.) Mother contends the court erred in finding good cause to depart from the placement preferences set forth in the Indian

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

Child Welfare Act (ICWA).[2] She also asks us to take as additional evidence a letter her appellate counsel received from R.H.'s tribe over three months after the judgment was rendered indicating that the tribe—which repeatedly declined the opportunity to intervene below—wants to "be involved in the case." Although an Indian tribe may intervene in state court dependency proceedings at any time (25 U.S.C. § 1911(c)), R.H.'s tribe has yet to intervene here. Accordingly, we deny mother's request and affirm.

## FACTS AND PROCEDURAL HISTORY

R.H. was born in December 2015. In April 2016, mother was arrested on an outstanding warrant. The Ventura County Human Services Agency (HSA) filed a dependency petition as to R.H. alleging failure to protect, no provision for support, and abuse of a sibling (§ 300, subds. (b), (g), & (j)). The petition alleged that mother and R.H.'s father (father)[3] both have histories of drug use, mental health issues, and domestic violence. Two of R.H.'s elder siblings were removed from mother and father's custody in Washington and were under a legal guardianship with the consent of the Round Valley Indian Tribes (the Tribe).[4]

---

[2] 25 U.S.C. § 1901 et seq.; § 361.31, subds. (c) & (h) (hereinafter § 361.31(c) & § 361.31(h)); Cal. Rules of Court, rule 5.484(b). All rule references are to the California Rules of Court.

[3] Father is not a party to this appeal.

[4] Although the Tribe refers to itself as a single tribe, it is actually "a sovereign nation of [six] confederated tribes" on the same reservation.

After R.H. was detained and placed in a foster home, mother and father indicated he had Native American ancestry with the Tribe. HSA notified the Tribe of the April 15, 2016 detention hearing and a copy of the dependency petition was sent to the Tribe and the Bureau of Indian Affairs (BIA).

At the detention hearing, the court found that ICWA might apply to R.H. Prior to the jurisdiction and disposition hearing, HSA filed a memorandum stating that father had reported he is a member of the Tribe but has no involvement with it and "has minimal contact with the paternal family." HSA sent the ICWA 030 notice to the Tribe and encouraged father to provide any information he might have or obtain about the paternal family.

In its jurisdiction and disposition report, HSA indicated that all of R.H.'s known paternal relatives had been solicited as possible placements for R.H. and that none of them were either able or willing to provide a permanent placement. Mother refused to provide contact information for her parents because she did not believe they would be able or willing to provide a placement for R.H. She also refused to provide any of her eight siblings' names or contact information.

At the June 2016 jurisdiction and disposition hearing, R.H. was declared a dependent and reunification services were ordered for mother and father. The following month, HSA received a letter from the Tribe stating that R.H. was eligible for enrollment. The Tribe did not express any intent to intervene in the case at that time. HSA submitted the application and the necessary documents for R.H.'s enrollment to the Tribe. At the July 6, 2016 ICWA review hearing, the court found that ICWA applied. On October 12, 2016, HSA received a letter from the Tribe stating that R.H. had been formally enrolled. The letter,

3

which was signed by Tribe President James A. Russ, made no reference to any intent to intervene in the proceedings.

In anticipation of the six-month review hearing, HSA submitted a memorandum documenting its ongoing efforts to communicate with the Tribe. HSA's ICWA paralegal Lauren Lara left the Tribe voicemails on May 11 and 12, 2016. On June 15, Lara spoke on the telephone with Steve Luna, the Tribe's Director and ICWA representative. On July 7, Lara left a voicemail message requesting that an ICWA representative testify on behalf of the Tribe. On July 22, Ventura County Counsel Linda Stevenson sent the Tribe an email requesting a response. On August 22, Lara spoke on the phone with Tribe representative Elizabeth Ranger. The following day, Stevenson sent Ranger an email requesting a response. Finally, on November 16, HSA social worker Tiffany Moody left the Tribe two voicemail messages requesting a return call. As of November 18, 2016, she had received no response.

HSA also submitted a declaration from ICWA expert witness Phillip Powers,[5] who opined that HSA had made active

---

[5] Section 224.6, subdivision (b)(1) provides that a juvenile court considering whether to terminate the parental rights of a parent of an Indian child shall "[r]equire that a qualified expert witness testify regarding whether continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." If the parties so stipulate, the court may accept a declaration or affidavit from a qualified expert in lieu of live testimony. (§ 224.6, subd. (e).) Mother does not dispute that Powers' declaration was properly accepted, or that he met the qualifications for an ICWA expert witness as set forth in subdivision (c) of section 224.6.

4

efforts to provide remedial and rehabilitative services to prevent the breakup of the Indian family and that those efforts had been unsuccessful. He also opined that returning R.H. to either parent would cause him severe emotional and physical harm. He was unable to determine the Tribe's position on the matter because he had "left several telephone messages for [the Tribe] without a return call" and had been "advised that [HSA] had been unsuccessful in establishing any meaningful contact with the tribe throughout [t]his case."

In a December 16, 2016 memorandum, HSA documented its continuing efforts to communicate with the Tribe about R.H.'s case. On November 29, Moody sent an email to Luna and Tribe ICWA representative Jamie Bloom. In that email, Moody identified herself as the HSA social worker assigned to R.H.'s case and noted that HSA had made numerous attempts to speak with a Tribe representative about the matter. Moody requested that a Tribe representative appear telephonically at the upcoming hearing on December 21 via CourtCall[6] and offered to arrange for the call if needed.

On November 30, 2016, Moody received an email from Ranger requesting additional documentation regarding the case. The following day, Moody sent Ranger HSA's most recent status review report, the juvenile court's case plan and findings and orders, and Powers' declaration. On December 7, Moody left Ranger a voicemail requesting a return call to discuss the case and the Tribe's recommendation.

On December 13, 2016, Moody spoke with Luna, who said he had not received the documents she sent to Ranger. In

---

[6] CourtCall is a service that facilitates telephonic court appearances.

addition to those documents, Luna requested additional information about R.H.'s foster parents. The following day, Moody sent Luna the home inspection report for the foster parents and additional information regarding the confidential foster home. She also resent the documents she had sent Ranger along with HSA's detention and jurisdiction and disposition reports.

On December 15, 2016, Moody called Ranger seeking the Tribe's input regarding HSA's proposed recommendation that parental rights to R.H. be terminated and that the matter be set for a section 366.26 hearing to implement a permanent plan of adoption by the foster parents. Ranger said she had not yet reviewed the documents Moody sent her but would do so and reply back the next day. After Ranger failed to reply, Moody left a voicemail message requesting a return call.

In a December 21, 2016 memorandum, Moody reported she had spoken to Ranger on December 19. Ranger confirmed she had read the documents Moody sent her and requested updates regarding the parents' efforts to comply with their case plans. As to HSA's proposed recommendation, "Ranger stated that while [R.H.] has been in the current foster home for 8 months, she was not comfortable with moving forward with respect to permanency with the foster family and stated that the tribe needed to explore extended paternal family members and determine if there are any paternal relatives that are able to take placement of the child." Ranger also confirmed that she or Luna would telephonically appear at the December 21, six-month review hearing via CourtCall as arranged by Moody.

When the matter was called for hearing on December 21, R.H.'s attorney stated that no one from the Tribe had called in to

6

CourtCall and that the operator had left the line open for approximately 50 minutes before terminating the call. After all of the relevant documents were admitted into evidence, Powers offered testimony reiterating the opinions stated in his declaration. Mother was present and testified. Father did not appear, but his counsel made an offer of proof as to what his testimony would have been. At the conclusion of the hearing, the court found HSA had made active efforts to avoid breaking up the Indian family and that returning R.H. to his parents would likely cause serious emotional or physical harm. Reunification services were terminated and the matter was set for a section 366.26 hearing. Notice of the hearing was served on the Tribe and the BIA by certified mail.

In its section 366.26 report, HSA recommended that parental rights to R.H. be terminated and that he be placed for adoption with his foster parents (the prospective adoptive parents). HSA reported that R.H. "appears to have a strong attachment to the prospective adoptive family and his placement in the home has remained stable throughout the dependency." R.H. cried at the window when his prospective adoptive father left for work, and the prospective adoptive parents' three-year-old son stated that R.H. was his brother. The prospective adoptive parents had also "expressed their commitment to raise [R.H.] with an understanding and connection to his tribal ancestry" and "have researched information about the Round Valley Indian Tribe to educate themselves, so that they may help support [R.H] in understanding his culture and heritage lifelong."

HSA also documented its numerous ongoing efforts to communicate with the Tribe through Luna and Ranger, the latter of whom had changed her surname to Redfeather. HSA also

7

submitted three memorandums providing more detailed accounts of those efforts that included attachments of the numerous emails and letters that had been sent to the Tribe. HSA reported among other things that during a May 5, 2017 telephone call, Luna told Moody that Redfeather was preparing for the section 366.26 hearing and that Moody had sent both Luna and Redfeather the confirmation page for the CourtCall hearing scheduled for that date. On May 9, Moody also left voicemail messages on the Tribe's main telephone line and Redfeather's cell phone reiterating that the hearing was set for the following day and that the CourtCall confirmation page had been sent.

At the May 10, 2017 hearing, Stevenson noted for the record that "the social worker set up CourtCall once again for the Round Valley Tribe and they did not call in once again." Stevenson later noted that "[HSA] has set up CourtCall for the tribe at least four times in these hearings and [HSA] has paid $75 each time to set that up which we don't get back. But I think that the tribe has not called in on any one of those occasions. So essentially they have not intervened, but we're just proceeding trying to meet all the requirements."

Mother testified at the hearing and also called Moody to testify. HSA presented all the documents it previously offered in the case, including Powers' expert declaration.

In asserting that the court had good cause under section 361.31(h) to depart from ICWA's placement preferences as set forth in section 361.31(c) and rule 5.482, Stevenson offered that HSA "from the get-go, tried to see if there were relatives who could take these kids [*sic*], and they were not available to do that. So ICWA does not require us to place [children] with people who don't want to take them. . . . And we cannot place with Indian

8

families [when] we don't even have the tribe calling us back, and they're not giving us any families. The child has to be placed with somebody. And so the child has been placed with a foster family. And I think that these arguments that because we didn't place with relatives or an Indian family, then we're out of compliance with ICWA are absolutely wrong."

At the conclusion of the hearing, the court found that R.H. was adoptable and that no exception to adoption had been established. The court stated that "[w]ith respect to ICWA, the court finds beyond a reasonable doubt, including the testimony of Mr. Powers, the qualified expert, that continued custody of the child by the parents is likely to result in serious emotional or physical damage to [R.H.] and that [HSA] made active efforts to provide remedial and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have been unsuccessful. With respect to the placement preference under ICWA, despite diligent efforts by [HSA] to locate and place with [father's] relatives, no relative has requested placement. The Tribe has not identified or sought placement with an Indian family nor has the Tribe responded to numerous messages from the social worker and Mr. Powers seeking the Tribe's input. Thus, there is good cause to modify the ICWA placement preference." Parental rights were terminated and adoption was selected as the permanent plan.

## DISCUSSION

### *Mother's Contentions*

Mother contends the court erred in finding good cause to depart from ICWA's placement preferences, as set forth in section 361.31(c). HSA responds that (1) mother's appeal should be

9

dismissed under the appellate disentitlement doctrine; (2) her contention is forfeited; and (3) the contention fails on the merits.

We decline to apply the appellate disentitlement doctrine, which recognizes an appellate court's inherent authority to stay or dismiss appeals by parties who willfully failed to follow the trial court's legal orders. (*In re E.M.* (2012) 204 Cal.App.4th 467, 474.) "In dependency cases, the doctrine has been applied only in cases of the most egregious conduct by the appellant, which frustrates the purpose of dependency law and makes it impossible to protect the child or act in the child's best interests. (*In re C.C.* (2003) 111 Cal.App.4th 76, 84 . . . [refusal to submit to a psychological evaluation]; *In re Kamelia S.* (2000) 82 Cal.App.4th 1224, 1229 . . . [father absconded with minor]; *Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293, 1299, . . . [grandparents—denied placement and guardianship— absconded with minor]; *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617, 623-624 . . . [mother abducted child].)" (*In re E.M.*, at p. 474.)

HSA asserts that mother's appeal should be dismissed under the appellate disentitlement doctrine because she "refus[ed] to disclose the identity and contact information for her eight siblings and contact information for her parents, who might have been able to provide [R.H.] with a relative placement." Although HSA notes that the court ordered mother to provide this information, her failure to comply was not so egregious that it frustrated the purpose of the dependency law or rendered it impossible to protect R.H. or act in his best interests.

We agree, however, that mother's claim is forfeited. Claims that the juvenile court failed to comply with statutory provisions that do not relate to the court's jurisdiction to act under ICWA

10

may be forfeited on appeal if not raised below. (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 707; *Fresno County Dept. of Children and Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 644-646 (*Fresno County*).) *In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412.) Mother contends the juvenile court "failed to follow the correct procedure in ruling on the [ICWA] placement issues." Although ICWA's placement preferences are both substantive and procedural, they are not jurisdictional and may thus be waived or forfeited. (See, e.g., *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1282 [recognizing that ICWA placement preferences are subject to waiver].)

Even if mother had preserved her claim, it would fail. "ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families. [Citation.] The most important substantive requirement imposed on state courts is that of 25 United States Code section 1915(a), which, absent 'good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families. [Citation.] . . . In this way, ICWA seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society. [Citation.]" (*Fresno County*, *supra*, 122 Cal.App.4th at p. 642.) "[A]ccording to ICWA's legislative history, Congress, by its use of the term 'good cause,' explicitly intended to provide state courts with flexibility in determining the placement of an Indian child. [Citations.]" (*Ibid.*)

"In determining whether good cause exists to depart from the ICWA's placement preferences, the court may take a variety

11

of considerations into account." (*In re Alexandra P.* (2014) 228 Cal.App.4th 1322, 1352 (*Alexandra P.*).)  The relevant guidelines enacted by the BIA concerning good cause exception to ICWA's placement preferences provide that "'a determination of good cause not to follow the order of preference set out [in 25 U.S.C. section 1915(a)] shall be based on one or more of the following considerations:  [¶]  (i)  The request of the biological parents or the child when the child is of sufficient age.  [¶]  (ii)  The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.  [¶]  (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.'  [Citation.]"  (*Id.* at pp. 1352-1353.)  These considerations, which are substantially identical to those set forth in rule 5.484(b), are not exclusive and courts are thus "free to consider other factors.  [Citation.]"  (*Id.* at p. 1353.)

HSA bore the burden of demonstrating good cause to depart from ICWA's placement preferences by clear and convincing evidence.  (*Alexandra P., supra*, 228 Cal.App.4th at p. 1348; § 361.31, subd. (j).)  "Our review of a juvenile court's finding of good cause to modify the placement preference order is subject to the substantial evidence test."  (*In re N.M.* (2009) 174 Cal.App.4th 328, 335.)  Although HSA bore the burden of establishing the requisite good cause below, on appeal mother bears the burden of proving the court's ruling was erroneous.  (*Alexandra P.,* at pp. 353-354.)

Mother asserts there is no evidence (1) "that [HSA] explored placements with [mother's] family" as provided in section 361.31(c)(1); or (2) "that [HSA] made 'reasonable efforts' to locate a conforming placement with another Indian tribe or

12

Indian family" as set forth in section 361.31(c)(3). The former assertion is belied by the record. HSA asked mother to provide information regarding her parents and siblings but she refused to do so. Because mother willfully obstructed HSA's efforts to place R.H. with a maternal relative, she cannot be heard to complain that those efforts were insufficient.

Mother's latter assertion is also unavailing. Section 361.31, subdivision (g) provides that "[a]ny person or court involved in the placement of an Indian child shall use the services of the Indian child's tribe, whenever available through the tribe, in seeking to secure placement within the order of placement preference" set forth in section 361.31(c). As HSA notes, "[i]t appeared right up until [the section 366.26] hearing that the [T]ribe was still looking into the placement issue." Under the circumstances, HSA had no duty to independently determine whether R.H. could be suitably placed with an Indian family from another tribe.

Moreover, the Tribe's inaction supports the court's finding of good cause to depart from ICWA's placement preferences. ICWA does not affect the statutory time limits that apply to dependency cases. For children like R.H. who were under the age of three when removed from their parents' custody, reunification services cannot exceed six months from the date the child entered foster care unless the permanent plan for the child is that he or she be returned and safely maintained in the parents' home no later than 18 months after his or her removal. (§ 361.5, subds. (a)(1)(B) & (a)(3)(A).) Once reunification services have terminated, the focus of the proceedings shifts to providing stability and permanence for the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

California dependency law also requires that children for whom reunification services have been ordered have a concurrent plan for legal permanence in case reunification services prove unsuccessful. (§§ 358.1, subd. (b), 16501.1, subd. (g)(10).) Shortly after R.H. was removed, HSA sought input from the Tribe regarding its preferences for his permanent placement. Reunification services were terminated at a hearing held eight months after R.H.'s removal. Although a Tribe representative was supposed to telephonically appear at that hearing, no one actually appeared. After that hearing, the focus of the proceedings shifted to finding a permanent and stable home for R.H. HSA continued its efforts to seek the Tribe's input, but those efforts failed. The Tribe never appeared in the matter. HSA arranged (and paid) for a Tribe representative to appear at no less than four hearings, including the section 366.26 hearing. Each time the Tribe was supposed to appear, it "stood up" the court and the parties.

In light of these circumstances, the court could implicitly conclude that the Tribe had no present interest in participating in the determination of R.H.'s permanent plan. Moreover, R.H. has never had any contact with the Tribe and is bonded to his prospective adoptive parents, with whom he has lived since he was four months old. This further supports the finding of good cause to depart from ICWA's placement preferences. (*Alexandra P.*, *supra*, 228 Cal.App.4th at pp. 1354-1356.)

### *Request to Take Additional Evidence*

In conjunction with the filing of her opening brief, mother filed a request that we take additional evidence on appeal pursuant to Code of Civil Procedure section 909. The proffered evidence consists of a letter the Tribe sent to mother's appellate

14

counsel on August 21, 2017, three days before mother's opening brief was filed. The letter, which is signed by Redfeather, states that "the Tribe will be involved in [R.H.'s] case" and that "[t]he Tribe is asking to appear by telephone for the court hearings." Redfeather goes on to state that "to place [R.H.] with a non Native family is against our Tribal Codes" and that "[i]n the event that there is an adoption, we are asking to be able to do a Tribal Customary Adoption for [R.H.]" The letter makes no mention of HSA's repeated prior contacts with the Tribe, or the fact that the Tribe was served with a copy of the order terminating parental rights as to R.H. with a permanent plan of adoption by his prospective adoptive parents.

In making the request, mother's counsel acknowledges "[t]he [T]ribe was notified of the[] proceedings and indicated it would intervene. However, it failed to respond to requests to recommend a placement for the child at the permanen[cy] planning hearing held on May 10, 2017." Counsel adds "I have advised the Tribe that it needs to file formal intervention papers with this Court and the Ventura County Juvenile Court. I anticipate that they will do so but I cannot guarantee it. This request is made on the presumption that the Tribe will follow through and is designed to protect their rights until they move, in a timely manner, to intervene in the appellate proceedings." Counsel goes on to state that "[mother] accepts the reality that, if the tribe does not intervene in a timely manner, this request may become moot." In opposing the request, HSA primarily relies on the rule that appellate courts should not consider postjudgment evidence offered to attack a juvenile court's judgment. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.)

To date, the Tribe has neither made a request to intervene in the case nor stated its intent to do so.  In mother's reply brief, her counsel—apparently abandoning his prior concession that mother's request would become moot if the Tribe did not seek to intervene "in a timely manner"—asks us to "issue an order to the Tribe directing it to indicate to this Court what its stance in this appeal is."

We deny the request to consider the Tribe's letter as additional evidence.  We also reject counsel's request that we compel the Tribe to state its position.  Appellant counsel made clear to the Tribe that it needed to formally intervene if it wanted to participate in the proceedings.  The Tribe could have intervened either orally or in writing at any time during the proceedings (rule 5.482(d)), yet never did so in either the juvenile court or this court.  There is no claim that the Tribe failed to receive proper notice at any stage of the proceedings.[7]  Moreover, although an Indian tribe may intervene in state court dependency proceedings at any time (25 U.S.C. § 1911(c)), the law does not grant tribes the right to unnecessarily and willfully delay the making of decisions that are essential to providing a dependent child the permanence and stability to which he or she is entitled under state dependency laws.  Under these circumstances, we decline to consider mother's proffered additional evidence.

---

[7] At oral argument, mother's counsel stated he had notified the Tribe of the date and time of the hearing and had advised the Tribe to call the court and make arrangements to appear telephonically.  No one from the Tribe ever called or otherwise contacted the court.

## DISPOSITION

The judgment (order terminating parental rights) is affirmed.

CERTIFIED FOR PUBLICATION.

PERREN, J.

We concur:

YEGAN, Acting P. J.

TANGEMAN, J.

Tari L. Cody, Judge

Superior Court County of Ventura
_____

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Leroy Smith, County Counsel, and Linda Stevenson, Assistant County Counsel, for Plaintiff and Respondent.