Filed 5/31/24  Teague v. Easton CA4/1
(unmodified opinion attached)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOANNA TEAGUE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>SHAWN EASTON,<br><br>    Defendant and Appellant. | D081242<br><br>(Super. Ct. No.<br>  37-2021-00022217-PR-TR-CTL)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed May 23,2024, is modified as follows:

In the last sentence of the first full paragraph on page 11, the phrase "January 2022" is changed to "January 2023" and the phrase "February 2022" is changed to "February 2023," so that the sentence now reads:

"In January 2023, Easton spent approximately $122,000 of the monies he had received, and another approximately $91,000 in February 2023."

In the first sentence of the second full paragraph on page 20, the phrase "December, January and February 2022" is changed to "December 2022 through February 2023," so that the sentence now reads:

"Even if Easton was truly unaware from December 2022 through February 2023 of Welling's appointment and his obligation as a beneficiary to deliver all Trust assets to her, as of March 2023 when Welling notified Stone about James's specific monetary transfers out of Trust bank accounts, Easton learned the funds he had received from his father—in amounts that substantially corresponded to the two large September 14, 2022 withdrawals James had made—belonged to the Trust."

There is no change in judgment.


McCONNELL, P. J.


Copies to: All parties

Filed 5/23/24  Teague v. Easton CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JOANNA TEAGUE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHAWN EASTON,<br><br>    Defendant and Appellant. | D081242<br><br><br>(Super. Ct. No.<br> 37-2021-00022217-PR-TR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Matthew C. Braner, Judge.  Appeal dismissed.

Niddrie Addams Fuller Singh and John S. Addams; The Stone Law Group and Kenneth H. Stone for Defendant and Appellant.

Law Office of John A. Adler and John A. Adler; Law Office of A. Daniel Bacalski, Jr. and A. Daniel Bacalski, Jr.; Dubé Law Office and Douglas Dubé for Plaintiff and Respondent.

Plaintiff and respondent Joanna Teague filed a Probate Code[1] section 17200 petition seeking in part to reform a trust that her stepfather James

---

[1]    Undesignated statutory references are to the Probate Code.

Crostini had amended after his wife Mary Crostini's death. Following a bench trial, the probate court granted the petition and reformed the trust, invalidating provisions authorizing James as the surviving spouse to revoke or amend it and deeming it irrevocable. Appellant Shawn Easton[2] contends the court erred in that there was no valid trust to reform given James and Mary's lack of mutual agreement on its terms and the court's factual findings are not supported by substantial clear and convincing evidence. Easton further contends procedural errors warrant reversal. Alternatively, he contends that if this court upholds the judgment to reform the trust, it should apply only as to Mary's share of the trust estate. Teague has moved to dismiss the appeal under the disentitlement doctrine. Because we find merit in and grant her motion, this opinion sets forth our reasons for dismissing the appeal and does not reach its merits. (*Gwartz v. Weilert* (2014) 231 Cal.App.4th 750, 757, citing Cal. Const., art. VI, § 14.)

FACTUAL AND PROCEDURAL BACKGROUND

Following well-established rules of appellate review, we recite the facts favorable to the judgment in Teague's favor. (*Hoffman v. Superior Ready Mix Concrete, L.P.* (2018) 30 Cal.App.5th 474, 478; see *Jackson v. LegalMatch.com* (2019) 42 Cal.App.5th 760, 767 [applying principle to findings of fact after a bench trial].) Though we adopt unchallenged facts from the probate court's

_____

[2] We refer to James and Mary by their first names for clarity, not out of disrespect. James died shortly after the court issued its final statement of decision and this court granted Easton's motion to substitute in as the appellant. Easton has asked that we take judicial notice of a January 2023 order appointing him special administrator of James's estate (*Estate of James V. Crostini* (Prob. Ct. San Diego County, 2023, No. 37-2022-00044420-PR-PW-CTL)). He maintains the order is relevant to his contention that the appealed-from judgment is voidable as entered before he was appointed special administrator, which prejudiced him because he could not file a motion for new trial. The request goes to the merits, which we do not reach.

2

statement of decision, we are not limited to those cited facts and evidence but may consider the entire record. (*In re Shaputis* (2011) 53 Cal.4th 192, 214, fn. 11.)

James and Mary were married in 1969. They both had children from prior marriages; at the time of Mary's death James had three surviving children including Easton, and Mary had four surviving children including Teague. They also had a biological daughter together, and James adopted two of Mary's children. James had an angry, volatile and controlling personality. He would lose his temper daily; often screaming, yelling, making threats, and sometimes hitting when he became agitated, which would occur at the slightest provocations. A couple of times, Teague saw bruising on Mary's face and asked whether James was responsible; Mary did not answer, but looked down and teared up. Mary did whatever James told her to do, but at the same time, she was a top real estate professional. She was also an avid reader.

In April 2004, James and Mary established the James and Mary Crostini Trust dated April 12, 2004 (the Trust). The declaration of trust's preamble characterized the Trust as "an inter vivos revocable trust to hold in trust the property now and hereafter made subject to this trust, with [James and Mary] as co-trustees, for the benefit of the trustors during their lives and thereafter for the benefit of their children and other beneficiaries, as set forth in this declaration of trust." (Some capitalization omitted.) The Trust corpus consisted of the couple's entire marital estate, all community property. The Trust made James and Mary the initial co-trustees, then provided that in the event of both of their deaths, resignation or incapacity, Mary's surviving children and their biological daughter would in a specified order act as co-trustees.

The Trust required the principal be paid to James and Mary for their benefit during their lifetime, and upon the death of one spouse, to pay the principal for the surviving spouse's benefit in accord with his or her accustomed manner of living. Upon the surviving spouse's death, the Trust distributed the estate in equal shares to Mary's surviving children and their biological daughter, and distributed $5,000 each to James's three children.

The Trust contained revocation and amendment provisions, which read in part:

"1.06 Revocation: The trustors may revoke in whole or part any trust created by this declaration at any time. While both trustors are living, revocation as to community property shall be made by written notice executed by at least one trustor and delivered to the trustee and to the other trustor. Community property so withdrawn shall be delivered to both trustors. . . . After one trustor is deceased, the surviving trustor may revoke in whole or in part any trust created herein by written notice delivered to the trustee, and any property so withdrawn shall be delivered to the trustor or as he or she otherwise directs." (Some capitalization, bold and underline omitted.)

"1.07 Amendments: At any time during their joint lives, the trustors jointly as to community property . . . may amend in any manner any trust created in this declaration by written notice delivered to the trustee. After the death of one trustor, the surviving trustor my amend in any manner any of the trusts created herein in like fashion." (Some capitalization, bold and underline omitted.)

The Trust provided it became irrevocable upon both trustors' deaths: "After both trustors are deceased, the trusts created herein shall become irrevocable and not subject to amendment." (Some capitalization omitted.)

4

Mary called a family meeting to tell Teague and others that everything would be divided equally between her children, but James told her to shut up. Mary also told Teague that James had written the trust and passed it by an attorney, so Mary thought it was legal. Mary expressed her hope that her children would keep the Trust property and pass it to their own children. Teague at one point asked her mother what was to keep James from changing her wishes, and she responded, "Oh, he can't do that, it's all written out plainly in the will or in the [T]rust." Mary also said that if James tried to do that, she would never forgive him. On the other hand, Mary did not tell either Teague or Teague's sister that the Trust was irrevocable. Teague's sister never observed James lie or mislead their mother, and Mary never told her that James held her hostage or forced her to do anything.

In 2010, James and Mary notified their biological daughter that she was removed as a trustee of the Trust. In May 2020, they included her again as a trustee. That daughter was never removed as a beneficiary.

Mary died in October 2020. At the hospital, James would not permit Teague and her siblings to be alone with Mary's body, but glared angrily at them while they said their goodbyes. At Mary's funeral, James described Mary's suffering in such detail as to upset Teague and other family members; he also screamed at another of Mary's daughters when she tried to put a rosary in Mary's casket, which contained nothing about her children.

Several weeks after Mary's death, James amended the Trust to eliminate Mary's children as beneficiaries and add Easton as a beneficiary. James kept their biological daughter as a beneficiary.

Teague filed a section 17200 petition "for construction or invalidity of trust provisions" as well as for an order removing James as the trustee, appointing a new trustee and for an accounting. In part, she alleged that

5

Mary never actually read the Trust but relied on James's representations to her as to its content and effect, that she was the victim of domestic violence at James's hands, and that Mary "dared not insist to James that she be allowed to read [the Trust], or to question him regarding its content and effect." She alleged that if James revoked or amended the Trust, "it will thwart Mary's intentions related to her estate plan" and that "Mary would not have executed the Trust except for James'[s] misrepresentation to her that it accomplished her intended estate plan." She alleged also that any amendment or revocation by James was done "through his fraud on Mary." Teague prayed for an order "[t]hat Part 1.06 of the Trust allowing for revocation of the Trust after the death of the first settlor to die, is invalid," "[t]hat Part 1.07 of the Trust allowing for amendment of the Trust after the death of the first settlor to die, is invalid" as well as for all other necessary and appropriate orders.

The matter proceeded to a bench trial on August 15, 2022. Teague's position was that the court should eliminate the Trust's revocation and amendment provisions, or alternatively construe James's amendment to apply only to his one-half of the community property so that Mary's half would be distributed according to her will. Teague, James and others testified at trial. James testified that it was his and Mary's intent to disinherit his biological children but give them a token distribution, and that Mary's children would be their heirs. According to him, they together told their wishes to an attorney who created a trust carrying out that intent. James testified the attorney recommended a trust and included the revocation clause. However, he and Mary prepared the documents removing then reinstating their biological daughter as trustee. James admitted in his

deposition that his agreement with Mary before her death was that he would carry out her intent to leave her property to her four children.[3]

Just before James rested his case, his counsel, acknowledging the trial took less than one day, requested a statement of decision. On September 9, 2022, the probate court issued a proposed statement of decision invalidating the Trust's revocation and amendment provisions and entering judgment for Teague. The parties submitted objections, with Teague asking the court additionally to appoint an independent fiduciary to administer the Trust.

On October 3, 2022, the court issued its final statement of decision reaching the same result in Teague's favor. Finding James not credible as to matters concerning the Trust's creation and Mary's knowledge, it ruled a "plethora of evidence" supported reforming the Trust; that "Mary believed from the time of the Trust's creation until the time of her death that the Trust's *beneficiaries* could not be changed, and that [James] represented to Mary her belief was true." It relied on James and Mary's relationship, as well as evidence that Mary had told her children James could not change the Trust because everything was "spelled out" or memorialized in it, and died believing the estate would be evenly divided among her children. The court ruled "[t]he evidence clearly supports that Mary's intent was to leave the Trust assets to the four children." The court found James knew of the revocation and amendment clauses, and the only reasonable inference from the evidence was that James "misrepresented, fostered, or encouraged Mary's mistake [concerning the Trust's revocability] by promising and agreeing with

---

[3] James also testified that he and Mary knew the difference between an irrevocable and revocable trust, and that the attorney had told them the Trust did not need to be irrevocable, "because the main article in there is it is revocable, and that's—that was the bottom line, that he told us that it's revocable, anything in it is revocable."

7

her to carry out her intent." It found James knew Mary trusted him and used it to his advantage. The court ruled the "facts help explain and are consistent with James'[s] determination to obviate Mary's intentions with regard to her assets and hid[e] the revocation clause from Mary in order to deviate the estate plans after her death."

James died on October 26, 2022. On November 9, 2022, in a filing submitted after the court's closure, his counsel, Kenneth Stone, notified the court about the death and petitioned to appoint Easton as James's estate's special administrator, asking that the court not take action to enter judgment or grant any of Teague's sought-after relief before Easton's appointment. The following day, the court entered judgment in Teague's favor, invalidating the revocation and amendment provisions of the Trust "[b]ased upon [James's] misrepresentations and promises," deeming the Trust irrevocable "[t]o avoid the inequity of rendering th[e] judgment ineffective by . . . [statutory] revocation," and appointing Kaitlyn Welling as successor trustee to the Trust.

James's counsel filed a notice of appeal on November 16, 2022.

DISCUSSION

I. *Teague's Motion to Dismiss Based on the Disentitlement Doctrine*

Teague has moved to dismiss the appeal based on the disentitlement doctrine. She maintains dismissal is appropriate given that Easton has willfully refused to comply with a postjudgment December 21, 2022 order that he turn over Trust assets, concealed his possession of those assets in part by moving to quash Welling's subpoenas for his personal and Trust bank records, and thwarted Welling's efforts to marshal the assets. Easton opposes the motion, claiming the probate court's December 21, 2022 order was never served on him, and he was unaware the funds he received from his father were from Trust accounts.

8

The moving and opposing papers reflect the following: Easton was involved in the case; he attended all but one deposition, as well as a mediation and the trial in this matter. On August 23, 2022, eight days after trial, James signed a second amendment to the Trust making Easton the Trust's sole beneficiary.[4]

On September 14, 2022, five days after the court issued its proposed statement of decision invalidating the Trust's revocation and amendment provisions, James closed savings and checking bank accounts held by the Trust, transferring $761,872.34 from them to personal "pay on death" accounts in his own name.[5]

On October 13, 2022, nine days after the court issued its final statement of decision, James took $715,290.84 from the two accounts, either withdrawing the money or writing a check, and transferred it to Easton, who deposited the funds—one deposit of $254,118 and one deposit of $461,172.84—into Easton's own account. In November 2022, after James's death, Easton closed James's account, withdrawing $14,107.07. Easton admits receiving these funds via check or transfer and depositing them in his personal account, claiming he was then unaware the funds were from Trust accounts but rather he understood they came from his father's personal bank accounts.

---

[4] During oral argument before this court, attorney Stone stated that after the trial, James "saw the writing on the wall" as to the lower court's decision.

[5] Specifically, James withdrew $461,168.54 from a Trust savings account, wrote a check to "cash" in the amount of $278,801.97 from a Trust checking account, and wrote another check payable to "cash" in the amount of $21,901.83 from a different Trust checking account.

Welling later applied ex parte to confirm her authority to act as successor trustee pending appeal. On December 14, 2022, about a month after entering judgment in Teague's favor, the court conducted a hearing on the application. The minute order indicates attorney Stone attended the hearing, as did Teague. The court, pursuant to the parties' oral stipulation, appointed Welling the Trust's temporary trustee.

Two days later, Easton wired $670,741.49 of the funds he had received from his father to an account held by his company, Easton Construction, of which Easton is the sole principal. By his own accounting, Easton immediately began spending the money on the day of the transfer, making over $70,000 in car payments and paying other personal expenses in the ensuing week.

About a week later, Easton, represented by attorney Stone and purporting to act as the second amended Trust's trustee, filed a section 17200 petition for instructions. He asked the court to determine (1) whether he was the Trust's trustee pending appeal; (2) whether the court's entry of judgment was void; and (3) who was entitled to distribution from the Trust. At this time, Teague first learned about James's second amendment to the Trust.

On December 21, 2022, the court issued its order on Welling's ex parte application. It ordered that the portion of its judgment appointing Welling as successor trustee of the Trust "is not stayed by the pending appeal . . . ." It further ordered Welling "may exercise all the ordinary powers of a trustee including, but not limited to, marshaling assets of the Trust" and "[t]hat all beneficiaries and parties to this action in possession or control of assets belonging to the Trust immediately turn them over to . . . Welling as successor trustee." The court ordered Easton to give Welling access to and

custody and control over specified real property. Easton spent approximately $91,000 of the funds in December 2022.

On January 18, 2023, Welling's counsel e-mailed attorney Stone, Teague's counsel and others to advise them that in photographing a house Welling saw that a safe had been broken into and several items removed from the house. She advised counsel that Welling had not received information on the Trust bank accounts or other Trust assets, and asked that their clients send any information they had in that respect to Welling. In January 2022, Easton spent approximately $122,000 of the monies he had received, and another approximately $91,000 in February 2022.

On March 14, 2023, Welling's counsel again e-mailed attorney Stone and Teague's counsel regarding the whereabouts of the funds withdrawn by James on September 14, 2022. She attached the bank checks and stated the funds should have remained in the Trust pending appeal. Counsel wrote: "If any of your clients has information on where these funds were subsequently deposited, or if they are in possession of the funds, please turn them over to [Welling] immediately. *The Court has made it clear that all Trust assets need to be turned over to* [*Welling*]*, and if she does not receive them, we will likely need to file a petition to have them returned.*" (Italics added.) Easton did not respond; during March and April 2023, he spent approximately $144,000 of the Trust funds on personal items.

In May 2023, Welling petitioned under sections 850, 859 and 17200 for an order to recover the Trust assets. In the verified petition, Welling stated that she had attempted to marshal the Trust bank accounts, but was informed that James had closed all the accounts on September 14, 2022. Welling delineated the specific sums James had withdrawn (including the $461,168.54 and $278,801.97) and stated she "believed that the funds were

11

placed in an account either in Mr. Easton's name, in a joint account with Mr. Easton, or in an account in [James's] name with Mr. Easton as a transfer on death beneficiary." She prayed for an order, among others, that Easton turn over all the funds he received from the Trust. That month and the following month, Easton spent another approximately $158,000 of the funds on personal items, leaving approximately $61,000 remaining. By the end of June 2023, Easton had depleted the funds. What remained were two uncashed cashier's checks for approximately $14,000 and $27,000 that Easton eventually delivered to his attorney.

In October 2023, Easton objected and responded to Welling's section 850 petition. In his verified response to Welling's statement concerning her belief about the funds being placed in Easton's accounts, Easton stated he "lack[ed] sufficient information and belief to enable him to answer" and denied the allegations.

In January 2024, Easton sought to stay Welling's section 850 petition. In a sworn declaration, Easton stated: "I currently have less than $1,000 in liquid assets. My wife and I own our personal residence, but own no other real property. I have no beneficial interest in any other real property, besides my beneficial interest in the real property that comprises the assets of the James and Mary Crostini Trust." Easton related that he had possessed the two cashier's checks from his father that the bank refused to honor, and he was "not in possession of any other checks that have not been negotiated." Easton stated: "Since this litigation began in 2021, I have not transferred any cash, liquid assets, real property or personal property to any person or entity and I have not made any transfer of property of any kind to a third party in fraud of creditors." He also moved to quash subpoenas issued by Teague's counsel for both the Trust and Easton's own bank records, which

12

motions were denied (with one limited in time) in late February and early March 2024.

On March 8, 2024, Teague sought ex parte to have the assets returned to the Trust, but the probate court denied the petition without prejudice, ordering only that Easton return the two cashier's checks to the bank. Attorney Stone delivered those checks to the bank's counsel the same day the court made its order.

In opposition to Teague's motion to dismiss, Easton states: "After my father's death on October 26, 2022, I was substituted in his place in order to prosecute the appeal that has been fully briefed and is awaiting oral argument. If the appeal results in a complete reversal, holding that the Trust was fully revocable and amendable following Mary Crostini's death, I will be entitled to the entire [T]rust estate. If the judgment is affirmed, I understand that I may be liable for the funds I received, which I now understand were originally held in the name of the . . . Trust." (Some capitalization omitted.)

II. *The Trustee's Actions to Recover Trust Monies, Sanctioned by Section 1310, Are Not Impacted by the Appeal*

As stated, the probate court in December 2022 ruled that its order appointing Welling as temporary trustee was not stayed pending the appeal. That order permitted Welling to exercise all trustee powers including to marshal the Trust assets. It required all beneficiaries and parties in possession or control of Trust assets to immediately turn them over to Welling.

13

The court's order was authorized by section 1310, subdivision (b), which governs a stay on appeal.[6] It provides in part: "Notwithstanding that an appeal is taken from the judgment or order, for the purpose of preventing injury or loss to . . . property, the trial court may . . . appoint a . . . special administrator or temporary trustee, to exercise the powers [of a fiduciary], from time to time, as if no appeal were pending. All acts of the fiduciary pursuant to the directions of the court made under this subdivision are valid, irrespective of the result of the appeal. An appeal of the directions made by the court under this subdivision shall not stay these directions." (§ 1310, subd. (b).)

"Acts taken pursuant to section 1310[, subdivision] (b) are valid regardless of the outcome on appeal." (*Sterling v. Sterling* (2015) 242 Cal.App.4th 185, 195.) Even if an appellant is successful, acts sanctioned by or taken pursuant to such an order "cannot be 'undone' . . . ." (*Ibid*.) The statute may be used to prevent a substantial monetary loss; "[t]here is no limitation on its application to a unique asset." (*Id*. at p. 199.)

### III. *Disentitlement Legal Principles*

"A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277; see also *Stoltenberg v. Ampton Investments Inc.* (2013) 215 Cal.App.4th 1225, 1230 (*Stoltenberg*).) This principle, what courts term the "disentitlement doctrine," gives an

---

[6] Section 1310, subdivision (a) provides that subject to enumerated exceptions, an appeal stays operation of an order. (*Conservatorship of McElroy* (2002) 104 Cal.App.4th 536, 555.)

appellate court inherent power to dismiss an appeal where an appealing party has refused to comply with lower court orders (*Stoltenberg*, at p. 1229; *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 265) or has "engaged in obstructive tactics." (*Gwartz v. Weilert, supra,* 231 Cal.App.4th at p. 757; *Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1391; *Stoltenberg*, at p. 1230.) To apply the doctrine, there need not be a formal adjudication of contempt. (*Ironridge Global*, at p. 265; *TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377, 379 [judgment of contempt is not required as a prerequisite to appellate court exercising power to dismiss under disentitlement doctrine].)

Disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." (*Stoltenberg*, *supra*, 215 Cal.App.4th at p. 1230; *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.*, *supra*, 238 Cal.App.4th at p. 265.) The doctrine is applied in the civil context "when a party's violation of a court order frustrates the other party's ability to protect their legal rights." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206-207.) It is " ' "based upon fundamental equity and is not to be frustrated by technicalities." ' " (*Blumberg v. Minthorne*, *supra*, 233 Cal.App.4th at p. 1391.)

Appellate dismissal has been held appropriate where judgment debtors frustrate efforts to enforce a judgment, including by transferring assets despite postjudgment orders forbidding them from doing so pending appeal. (*Gwartz v. Weilert*, *supra*, 231 Cal.App.4th 750, 752.) In *Gwartz*, equitable principles favored dismissing the appeal because the record showed that, while admitting they transferred assets, defendants sought "the benefits of an appeal while willfully disobeying the trial court's valid orders and thereby frustrating defendants' legitimate efforts to enforce the judgment." (*Id.* at p.

15

761.)  In *TMS Inc. v. Aihara*, *supra*, 71 Cal.App.4th 377, the court in a similar context applied the doctrine to parties violating an order requiring postjudgment actions.  (*Id.* at p. 378.)  There, judgment debtors—a defendant and two companies—refused to comply with an order to answer postjudgment interrogatories; the defendant left the jurisdiction to Japan, and refused to assist his attorneys in providing requested financial information.  (*TMS*, at p. 379.)  The court dismissed their appeal from the judgment, holding it had the inherent power to do so without a judgment of contempt.  (*Id.* at pp. 379-380.)

In *Kottemann v. Kottemann* (1957) 150 Cal.App.2d 483, the appellant undertook repeated acts to thwart his former wife's attempts to enforce an interlocutory judgment for spousal support, closing bank accounts, putting cash assets into cashier's checks, deeding a joint tenancy house to a third party in violation of a restraining order, and disappearing to avoid being served with an order to show cause re contempt or completing his deposition.  (*Id.* at p. 485.)  His appellate attorneys denied knowledge of his whereabouts.  (*Id.* at p. 486.)  In dismissing the appeal from the interlocutory judgment of divorce, the court stated:  "That [the appellant] intends to frustrate plaintiff's efforts to obtain the fruits of her judgment . . . is equally clear.  That he entertains an intention to defraud her cannot be gainsaid."  (*Id.* at p. 488.)

In *Stone v. Bach* (1978) 80 Cal.App.3d 442, the litigant was deemed to have made a "deliberate effort to achieve a stay of execution of the money judgment against him without complying with legal procedures."  (*Id.* at p. 448.)  His excuse for refusing to comply with lower court orders to deposit partnership funds into trust and to be sworn for examination was that the orders and judgment were invalid, as he would demonstrate on appeal. (*Ibid.*)  The court dismissed his appeal, stating, "This is the worst kind of bootstrapping.  A trial court's judgment and orders, all of them, are

16

presumptively valid and must be obeyed and enforced. . . . They are not to be frustrated by litigants except by legally provided methods." (*Ibid*.; see also *MacPherson v. MacPherson, supra*, 13 Cal.2d at p. 277 [dismissing appeal where appellant "wilfully and purposely evaded legal processes and contumaciously defied and nullified every attempt to enforce the judgments and orders of the California courts, including the very order from which he seeks relief by this appeal"].)

In *In re A.K.* (2016) 246 Cal.App.4th 281, the Court of Appeal explained that the disentitlement doctrine is " 'not only applicable to disobedience of the order being appealed; it also applies to "egregious" conduct that frustrates the juvenile court from carrying out its orders . . . .' " (*Id*. at p. 286, quoting *In re E.M.* (2012) 204 Cal.App.4th 467, 476-477.) There, the court dismissed an appeal by a father who had engaged in an "extraordinary and unmitigated pattern of obstruction" by refusing to drug test or participate in his child's dependency case, and exhibited hostile behavior toward social workers, showing a "pervasive indifference to the child's safety and to the amelioration of the conditions giving rise to the dependency." (*In re A.K.*, at p. 286.) The court held the father "possessed 'an attitude of contempt to legal orders' and the dependency process"; "[f]ather's conduct frustrated, if not paralyzed, the ability of [the county's children and family services], the court, and his own attorney to obtain the information necessary to determine whether he is an offending parent, and what services, if any, are necessary to enable him to reunify with his daughter." (*Ibid*.) Dismissal was appropriate due to the " ' "egregious" conduct that frustrate[d] the . . . court from carrying out its orders . . . .' " (*Ibid*.)

IV. *The Relevant Equitable Considerations Favor Dismissal*

It is evident that having learned of the court's proposed statement of decision against him, James took it upon himself to remove large sums of money from the Trust. After the court issued its final statement of decision rendering the Trust irrevocable, he then transferred most of those funds to Easton, an obvious effort to hamper and frustrate Teague's ability to eventually enforce a presumptively valid judgment (*Stone v. Bach, supra*, 80 Cal.App.3d at p. 448) through appropriate legal means. This is precisely the sort of egregious self-help taken in disregard of the appellate process and obstructive conduct for which courts have invoked the disentitlement doctrine. " '[I]t would be a flagrant abuse of the principles of equity and of the due administration of justice to consider the demands of a party who becomes a voluntary actor before a court and seeks its aid while he stands in contempt of its legal orders and processes.' " (*Stone v. Bach*, at p. 444.) While James was not held in contempt of any court order, as stated, a finding of contempt is not necessary to invoke the doctrine. (*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc., supra*, 238 Cal.App.4th at p. 265.) It is of no moment that the court had not yet entered its formal judgment; James's intent was clear, and technicalities must not frustrate disentitlement in an appropriate case. (*Blumberg v. Minthorn, supra*, 233 Cal.App.4th at p. 1391; *Stoltenberg, supra*, 215 Cal.App.4th at p. 1230; *Stone v. Bach, supra*, 80 Cal.App.3d at p. 444.)

The record shows Easton—who James had by then made a beneficiary—conducted himself in the same vein: concealing his receipt of Trust assets from Welling so as to frustrate her efforts to preserve them in protection of the judgment. In opposing dismissal, he asserts he did not attend the December 14, 2022 ex parte hearing and did not receive a copy of

18

the court's December 21, 2022 order until March 2024. Easton claims he and his counsel were not served with the court's December 21, 2022 order. The California Supreme court in *MacPherson v. MacPherson* addressed a similar contention by a appellant facing dismissal who claimed there was "no evidence that he received notice or had actual knowledge of the terms of any order or judgment which he is charged with violating . . . ." (*MacPherson v. MacPherson, supra*, 13 Cal.2d at p. 278.) The court observed that the record evidence—particularly the wife's affidavit—"clearly indicates that appellant had full knowledge of the custody provisions of the divorce decrees." (*Id*. at p. 279.) It continued: "Moreover, in view of the conduct of the parties with respect to custody of the minors over the period from 1930 to 1936, it would test credulity to believe that appellant was without actual knowledge of the terms of the custody provision. *Actual notice or knowledge is all that is required*." (*Ibid*., italics added.)

Here, attorney Stone was present at the December 14, 2022 ex parte hearing, giving him actual knowledge of Welling's appointment as successor trustee to marshal Trust assets. Stone represented Easton five days later on Easton's petition for instructions. " '[A]n attorney is his client's agent, and . . . the agent's knowledge is imputed to the principal even where . . . the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact.' " (*Roche v. Hyde* (2020) 51 Cal.App.5th 757, 797.) This presumption of imputed knowledge—which is "irrebuttable" (*Roche*, at p. 797)—"applies to what the agent subjectively *does* know as well as what the agent reasonably *should* know." (*Bergstrom v. Zions Bancorporation, N.A.* (2022) 78 Cal.App.5th 387, 399; *Roche*, at pp. 797-798.) Attorney Stone had actual knowledge of the court's ruling confirming Welling's appointment; he was dutybound to know the court

19

would issue an order after the ex parte hearing as well as the trustee's obligations to marshal and preserve trust property, and Easton is charged with this knowledge.[7]

But in our view, Easton's claim of ignorance is belied by the record; his knowledge of Welling's appointment is evidenced by the fact he wire-transferred $670,741.49 of the Trust funds to his corporate account two days later. It would "test credulity" (*MacPherson v. MacPherson, supra*, 13 Cal.2d at p. 279) to see that act as anything other than an effort to conceal those assets from Welling.

Even if Easton was truly unaware in December, January and February 2022 of Welling's appointment and his obligation as a beneficiary to deliver all Trust assets to her, as of March 2023 when Welling notified Stone about James's specific monetary transfers out of Trust bank accounts, Easton learned the funds he had received from his father—in amounts that substantially corresponded to the two large September 14, 2022 withdrawals James had made—belonged to the Trust. Easton made no effort to disclose to Welling his receipt of the large transfers. To the contrary he continued spending it with increasing alacrity until he exhausted the funds in June 2023. He then disingenuously claimed in verified pleadings to lack anything more than $1,000 in liquid assets, denied transferring any money, and pleaded ignorance about the Trust funds placed in his accounts. It was not enough that Easton endeavored to put the Trust funds taken by his father

---

7    To the extent Easton's knowledge is constructive, it is still actual. " ' "Constructive notice is 'the equivalent of *actual knowledge* . . . .' " ' " (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1385.)

beyond Welling's reach, but he immediately, intentionally, and systematically spent them until they were gone.

In opposing Teague's motion to dismiss, Easton appears to rest on the pending appeal and its potential success, which would obviate his misconduct. But the appeal does not impact Welling's efforts, and courts have rejected that kind of argument as the "worst kind of bootstrapping . . . ." (*Stone v. Bach, supra*, 80 Cal.App.3d at p. 448.) While Easton states he returned two certified checks, he has not assured this court that he has taken efforts to return what he now unquestionably knows was money belonging to the Trust. He has not shown he will endeavor to comply with the court's order that beneficiaries and parties return all of the Trust assets to Welling. Under these circumstances, it is inequitable to allow Easton to seek the benefits of an appeal while willfully disobeying the probate court's valid orders and frustrating efforts to protect assets in furtherance of the judgment.

Our disposition remains. The *Stone v. Bach* court considered conditionally dismissing the appeal, but did not deem it appropriate, instead stating, "Prior to expiration of our jurisdiction, Bach may seek partial or total relief from this dismissal, based upon compliance with the spirit of our opinion; any such request will be given due consideration." (*Stone v. Bach, supra*, 80 Cal.App.3d at pp. 448-449.) In *Stoltenberg, supra*, 215 Cal.App.4th 1225, the Court of Appeal delayed finality of its dismissal order for 30 days to give the defendants an opportunity to seek reinstatement. (*Id*. at p. 1234.)[8]

---

[8] In *Stoltenberg, supra*, 215 Cal.App.4th 1225, the defendants subsequently did not provide a "competent and unequivocal showing that they had complied fully" with an underlying subpoena, or that the involved out-of-state court "made an express finding of full compliance." (*Id*. at p. 1236.) The Court of Appeal thus denied reinstatement. (*Ibid*.)

21

The purpose of the disentitlement doctrine is to induce compliance with court orders. (*Findleton v. Coyote Valley Band of Pomo Indians* (2021) 69 Cal.App.5th 736, 758.) By Easton's account, he has depleted the funds, and has no assets but his residence. Under these circumstances, it would serve no purpose to give Easton an opportunity to repay the money and seek reinstatement of this appeal.

## DISPOSITION

The motion to dismiss the appeal is granted. Teague shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.