Filed 5/28/25  In re D.P. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | B336742 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.W.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 20LJJP00257C, 20LJJP00257D |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cathy J. Ostiller, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

—————————

Mother appeals a dependency judgment based on a jurisdictional finding that she involved her 10-year-old son D.P. in a scheme to smuggle illicit narcotics into a prison during a visit with the boy's father.[1]  Three days after the visit, father died from an overdose when a balloon containing methamphetamine ruptured in his stomach.  Mother contends there was insufficient evidence to authenticate audio and video recordings revealing the alleged scheme and she argues the juvenile court erred by admitting secondary evidence of the recordings' contents.  We find no abuse of discretion and affirm.[2]

---

[1]     After declaring D.P. and his half-brother A.B. dependent children and removing them from mother's custody, the juvenile court terminated jurisdiction over A.B. and issued a custody order granting A.B.'s father sole physical custody of the child.  Mother does not appear to challenge the orders concerning A.B.  To the extent she does mean to challenge those orders, our reasons to affirm the judgment with respect to D.P. apply equally to his half-brother.

[2]     County Counsel on behalf of the Los Angeles County Department of Children and Family Services (the Department) argues we should dismiss mother's appeal under the disentitlement doctrine, citing records showing she surreptitiously removed D.P. from his foster placement in violation of the juvenile court's disposition order.  We decline to dismiss the appeal.  "Appellate disentitlement 'is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction.' " (*In re E.M.* (2012) 204 Cal.App.4th 467, 474.) "In dependency cases, the doctrine has been applied only in cases of the most egregious conduct by the appellant, which frustrates the purpose of dependency law and makes it impossible to protect the child or act in the child's best interests." (*Ibid.* [cataloguing cases].)

## BACKGROUND

On June 20, 2023, prison staff found D.P.'s father dead in his cell. Two intact bindles of methamphetamine and one ruptured bindle were recovered from father's stomach during an autopsy.[3] The coroner determined the cause of death was methamphetamine intoxication. A search of father's cell uncovered another bindle containing methamphetamine as well as notes indicating the distribution of narcotics.

At the time of his death, father had only four approved visitors—mother, D.P., D.P.'s half-brother A.B., and another friend. Mother had visited father four times since his incarceration in May 2018. The most recent visits had occurred on June 16 and June 17, 2023 (three days before father's death).

---

Mother has requested we take judicial notice of court records showing that D.P. was subsequently returned to the Department's custody and that mother has since been in compliance with her case plan. We grant the request. While there is no question that mother's violation was serious and likely endangering to her child, the juvenile court was and is in a far better position to address these matters than we are, and, in any event, there is nothing to indicate mother remains in " 'an attitude of contempt to legal orders and processes of the courts of this state.' " (*In re E.M., supra,* 204 Cal.App.4th at p. 474, quoting *MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.) Dismissal is not warranted under the current circumstances. (See *In re E.M.,* at p. 474 [" 'Dismissal is not " 'a penalty imposed as a punishment for criminal contempt. It is an exercise of a state court's inherent power to use its processes to induce compliance' " with a presumptively valid order.' "].)

[3]     Two other bindles containing toilet paper were also recovered.

Officer Nicholas Rodriguez of the California State Prison-Sacramento Investigative Services Unit investigated father's death. The following facts are taken from his August 23, 2023 memorandum to the prison warden regarding the investigation.

In the month leading up to father's death, his prison call log showed he made 238 recorded telephone calls to a 213-area-code number associated with mother. On June 16, 2023, mother and the two children had a visit with father. Later that day, father placed a series of at least seven calls to mother, during which they discussed arrangements for mother to meet with someone named " 'Crazy' " in exchange for $180. In one call, mother told father "there is ten of them," which Officer Rodriguez interpreted to refer to the bindles of methamphetamine found in father's cell and stomach after his death.[4] Father told mother, " 'We shouldn't be having any talk period after we just talked in the visiting room.' "

The next day, on June 17, 2023, mother and the two children had a second visit with father. A recording from the prison's audio-visual surveillance (AVS) system captured what Officer Rodriguez described as "suspicious activity" during the visit. The recording showed mother and D.P. enter the women's restroom together and stay inside for approximately 10 minutes. After they returned, D.P. built a fort with cushions. Two minutes later, he emerged from the fort holding a bag of chips and joined

---

[4]    In an interview conducted as part of the investigation, father's cellmate recounted that father had said he swallowed 10 balloons of methamphetamine that he received from a recent visitor. The cellmate said father wanted to sneak drugs into the facility " '[be]cause it's bad out there for his family and his girl[friend] is living in a car.' "

mother and father in the back of the visiting room. An overhead screenshot taken from the AVS recording showed D.P. eating from the bag with what Officer Rodriguez marked as "bindles wrapped in a light-colored material" inside. D.P. then handed the chip bag to father, who walked off on his own toward the front of the visiting area. The AVS recording captured father lifting the chip bag to his mouth several times "to swallow the contents" and then "immediately drinking water and/or soda." At one point on the recording, Officer Rodriguez observed father drop, quickly pick up, and swallow "what appear[ed] to be a bindle" similar to those recovered from his stomach in the autopsy.

That evening father called mother to tell her he was trying to "throw up 'Hard Candies' " and "not feeling well." He said he had swallowed toilet paper balled up in the finger of a glove and " '[s]even came out . . . three of them are still in there.' " The next day he called mother to tell her, " 'They all went down. They are in my stomach now.' " Mother replied, " 'You should be able to shit it out then. . . . I need you to finish business.' " Two days later, an inmate who referred to himself as " 'Janky' " called mother using father's personal identification number. Janky told mother that father had passed and she needed to "stay out the way."

On November 28, 2023, after concluding mother had involved her children in a scheme to smuggle narcotics into the prison, Officer Rodriguez reported his findings to the Department. Although the video footage had since been deleted, he offered to provide the Department with his investigation memorandum, which included a screenshot of D.P. holding the chip bag containing bindles of methamphetamine.

5

A social worker interviewed mother at her home. She provided two telephone numbers for contact, including the 213-area-code number recorded in Officer Rodriguez's memorandum. Mother confirmed she last saw father during a visit on June 17, 2023 and she had escorted the children to the restroom during the visit. She denied she had done anything to smuggle bindles of narcotics into the prison for father. She said she was aware father used "synthetic weed" in prison, but denied knowledge of any other drug use. She said his death from a " 'cocaine' overdose" surprised her.

D.P. also confirmed that mother had taken him to the restroom during the visit. After returning, he remembered " 'making a doggy fort to hide in it and scare my brother.' " He also recalled that he had a bag of chips in the fort and that he gave the chips to father. He did not notice anything "different" or "heavy" about the chip bag when he handled it. He did not remember mother putting anything in the chip bag before he gave it to father.

The Department filed a dependency petition on behalf of D.P. and his half-brother, alleging mother endangered the children by involving them in "illicit drug trafficking" while they were under her care and supervision. With respect to D.P., the petition alleged mother used the child to smuggle balloons containing methamphetamine into the prison by concealing the balloons in a bag of chips he was eating from. The reports in support of the petition included Officer Rodriguez's investigation memorandum and statements regarding his findings.

Mother filed objections under Evidence Code sections 1401, 1521, and 352 to exclude all evidence referencing or summarizing

(1) "audio recordings made of conversations between persons identified as" father and mother; and (2) "video and audio recordings of a June 17, 2023 visit" between father, mother, and the children. At the adjudication hearing, mother's counsel argued the screenshot included in Officer Rodriguez's memorandum was inadequate to "substantiate" the "destroyed" video footage of the visit. With respect to the telephone recordings, she insisted there was "no foundation laid to determine whether [mother] is the person that's actually speaking on the phone." Counsel emphasized she was "not making a hearsay objection." Instead, she objected to the lack of foundation to introduce the evidence and argued, "if they want to have any reference to this video and these audio recordings, they should have provided these audio and video recordings to the court."

The juvenile court overruled the objections, concluding the evidence was sufficient to accept Officer Rodriguez's summaries of the video and audio recordings "just as in any other situation where the court is adopting or relying on statements of an officer that are in a report."

The children's counsel joined the Department's request to sustain the petition and remove the children from mother's custody. Both relied on Officer Rodriguez's statements and memorandum to argue mother placed the children at risk by using D.P. to smuggle methamphetamine to father in a chip bag.

The juvenile court sustained the petition and entered a disposition order removing the children from mother's custody. This timely appeal followed.

## DISCUSSION

Mother does not dispute that the evidence admitted regarding the prison recordings, if credited, was sufficient to support the court's jurisdictional finding and disposition order.[5] However, she argues the Department failed to establish the authenticity of the recordings and, therefore, the court erred in admitting secondary evidence of their contents. Mother also contends the secondary evidence was unfair and unduly prejudicial. Because this evidence was the sole basis for the court's findings, she insists the judgment must be reversed.

[5] In arguing the evidence was insufficient to support the judgment, mother repeatedly invokes what she labels "*legally admissible* evidence," arguing, for example, that the "legally admissible evidence introduced at the jurisdictional hearing overwhelmingly demonstrates Mother was a fit, caring, capable, nurturing and attentive parent with whom the children were bonded and felt safe." At other points she emphasizes that she "consistently denied all alleged wrongdoing" and says there was "no evidence Mother had methamphetamine in her possession at any time." We thus understand her sufficiency of the evidence arguments to be premised on her contention that the juvenile court erroneously admitted evidence of her culpability in the drug trafficking scheme. To the extent she does mean to challenge the sufficiency of the evidence independently of her evidentiary objections, we think it should go without saying that proof of a parent involving her 10-year-old son in a conspiracy to bring deadly narcotics into a state prison is sufficient to support dependency jurisdiction under Welfare and Institutions Code section 300, subdivision (b). (See, e.g., *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 994 [dependency jurisdiction supported where father was children's primary caretaker and evidence suggested his drug trafficking activities sometimes took place in the family home].)

1. ***Standard of Review and Governing Law***

We review challenges to a juvenile court's ruling on the admissibility of evidence for an abuse of discretion. (*In re K.B.* (2015) 238 Cal.App.4th 989, 995.) We will not disturb the court's ruling except on a showing that it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Ibid.*) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.)

In a dependency proceeding, except as provided in Welfare and Institutions Code sections 355 and 355.1 and California Rules of Court, rule 5.684(c) and (d), "the admission and exclusion of evidence must be in accordance with the Evidence Code as it applies to civil cases." (Cal. Rules of Court, rule 5.684(b).)[6]

---

[6] Statutory references are to the Welfare and Institutions Code, except as otherwise designated. Under section 355, a social study prepared by the petitioning child welfare agency, and hearsay evidence contained in it, is generally admissible and constitutes competent evidence to support a jurisdictional finding. (§ 355, subd. (b); see also Cal. Rules of Court, rule 5.684(c)(1) ["A social study, with hearsay evidence contained in it, is admissible as provided in section 355."].) However, if a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence, this evidence will not be sufficient by itself to support a jurisdictional finding, unless (as relevant here) the "hearsay declarant is a peace officer." (§ 355, subd. (c)(1)(C).) Section 355.1 creates a rebuttable presumption in favor of dependency jurisdiction in circumstances not relevant here.

**2.**     ***Substantial Evidence Proves the Authenticity***
***of the Video and Audio Recordings***

Evidence Code section 1401 requires authentication of a writing, video, or audio recording before the recorded media or "secondary evidence of its content" may be received into evidence. (Evid. Code, § 1401, subds. (a) & (b); see *id.*, § 250 [" 'Writing' " under the Evidence Code includes every "means of recording upon any tangible thing."]; *People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*); *Dawkins, supra*, 230 Cal.App.4th at p. 1002.)  The proponent of the recorded media has the burden of producing sufficient evidence to sustain a finding that it is authentic.  (Evid. Code, § 403, subd. (a)(3).)

Mother contends Officer Rodriguez's memorandum and statements are insufficient to authenticate the audio and video recordings.  Although she acknowledges the evidence "linked the phone number" in the audio recordings to her, she insists Officer Rodriguez failed "to provide authenticating information" sufficient to prove "the voice he heard on the jail recording was

---

Notwithstanding mother's objections under Evidence Code sections 1401, 1521, and 352, the Department argues there was no need to establish the authenticity of the recordings because Officer Rodriguez's statements about what he observed were admissible under section 355, subdivision (c)(1)(C).  This is plainly incorrect.  Section 355 establishes an exception to the hearsay rule in dependency proceedings—it does not (as rule 5.684(b) makes clear) displace other rules governing the admission of evidence.  This, of course, includes the Evidence Code provisions requiring authentication of recorded media. (See *People v. Dawkins* (2014) 230 Cal.App.4th 991, 1004 (*Dawkins*) ["the issues of hearsay and authentication are independent of one another"].)

[her] voice." Likewise, with respect to the video footage, although she acknowledges the memorandum included a screenshot from the purported recording, she emphasizes "this still image bears no date or time stamp," which she contends is necessary to "provide sufficient authentication."

Mother's contentions are premised on too narrow a view of what evidence is sufficient to authenticate a video or audio recording. "Authentication" of recorded media is statutorily defined as the "introduction of evidence sufficient to sustain a finding that it is the [recording] that the proponent of the evidence claims it is" or "the establishment of such facts by any other means provided by law." (Evid. Code, § 1400; *Goldsmith, supra,* 59 Cal.4th at p. 266.) As our Supreme Court has explained, this statutory definition ties authentication to relevance: " '[B]efore any tangible object may be admitted into evidence, the party seeking to introduce the object must make a preliminary showing that the object is in some way relevant to the issues to be decided in the action.' " (*Goldsmith*, at p. 266, quoting Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1400, p. 440.) Accordingly, the "first step" in assessing authenticity "is to determine the purpose for which the evidence is being offered." (*Goldsmith,* at p. 267.) "The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case." (*Ibid.*)

The "foundation" for authenticating a recording "requires that there be sufficient evidence for a trier of fact to find that the [recording] is what it purports to be, i.e., that it is genuine for the purpose offered." (*Goldsmith, supra,* 59 Cal.4th at p. 267.) "This foundation may, but need not be, supplied by the person [who made the recording] or by a person who witnessed the event

11

being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location." (*Id.* at p. 268.) "Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the [recording] is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the [recording's] weight as evidence, not its admissibility.' " (*Id.* at p. 267.)

We begin with the video footage. The Department's purpose in offering Officer Rodriguez's statements about the footage was to give an account of what happened during the June 17, 2023 prison visit between father, mother, and D.P. Thus, to authenticate the footage as the basis for admitting secondary evidence of its contents, all the Department had to show was that the video recording Officer Rodriguez reviewed was in fact a recording of the June 17, 2023 prison visit—i.e., that it was "genuine for the purpose offered." (*Goldsmith, supra,* 59 Cal.4th at p. 267.) There was more than sufficient evidence for the juvenile court to find it was authentic for this purpose. To begin, Officer Rodriguez attested to the recording's authenticity by stating in his memorandum that it came from the prison's AVS system and that it captured the visit between father, mother, and D.P. that occurred on "Saturday, June 17th, 2023, at approximately 1018 hours." There is no dispute that Officer Rodriguez—as an officer with the California State Prison-Sacramento Investigative Services Unit—was familiar with the prison's AVS system. Nor is there any dispute that he could positively identify father, whose intake picture and other identifying characteristics were included in the officer's memorandum.

12

Moreover, circumstantial evidence and other witness testimony corroborated Officer Rodriguez's account that the footage he reviewed was in fact a recording of the June 17 visit. (See *Goldsmith, supra,* 59 Cal.4th at pp. 267–268.) Perhaps most compelling, the officer noted in his report that the footage showed D.P. built a fort with cushions during the visit and subsequently emerged from the fort holding the bag of chips that he later passed to father. In an interview conducted more than four months after Officer Rodriguez transmitted his report to the prison warden, D.P. confirmed that, during the June 17 visit, he remembered " 'making a doggy fort' " and that he had a bag of chips in the fort that he later gave to father. The consistency between Officer Rodriguez's observations and D.P.'s account of the visit support a reasonable inference that what Officer Rodriguez reviewed was a genuine video recording of the June 17 visit between father, mother, and D.P. (See, e.g., *In re K.B.*, *supra*, 238 Cal.App.4th at p. 998 [photographs of juvenile holding firearm sufficiently authenticated by evidence that he was arrested wearing the same clothes and in the same location depicted in the photographs].)

Circumstantial evidence was also sufficient to establish the authenticity of the recorded phone calls Officer Rodriguez reviewed. Much like the video footage, the Department's purpose in offering secondary evidence of the phone calls was to give an account of discussions between father and mother about the alleged scheme to smuggle narcotics into the prison. Thus, to authenticate the recordings for this purpose, the Department had to prove only that mother and father were the parties speaking on the recorded calls. As discussed, mother concedes the recordings captured calls father made to one of her phone

numbers, but she argues the evidence was insufficient to prove she was the female voice on the calls. The juvenile court astutely rejected this argument when mother's counsel advanced it at the adjudication hearing. As the court noted, according to Officer Rodriguez's report, "whoever" it was that was talking to father on the calls spoke about "coming to the facility, and then within a short period of time, mother shows up at the facility." Indeed, in one of the calls that occurred the evening of mother's first prison visit, Officer Rodriguez reported that father told the other party, " 'We shouldn't be having any talk period *after we just talked in the visiting room*.' " (Italics added.) Based on this circumstantial evidence, the court reasonably inferred that it was in fact mother on the other side of the recorded phone conversations. We find no error in the court's admission of this evidence over mother's objection to its authenticity.

3. ***The Record Does Not Compel a Finding that Admission of Secondary Evidence Was Unfair***

Regardless of authenticity, mother argues the court should have excluded Officer Rodriguez's statements under the secondary evidence rule, because the circumstances rendered admission of this evidence "unfair." We disagree.

The secondary evidence rule provides that the "content of a writing may be proved by otherwise admissible secondary evidence," except that the court "shall exclude secondary evidence" of the writing's content if it determines either "[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion" or "[a]dmission of the secondary evidence would be unfair." (Evid. Code, § 1521, subd. (a)(1) & (2); see *People v. Skiles* (2011) 51 Cal.4th 1178, 1188; see also *People v. Son* (2020) 56 Cal.App.5th 689, 696

14

["A video is a writing for purposes of the secondary evidence rule."].) A "classic circumstance for exclusion" under the unfairness exception is if "the proponent" of the evidence "destroyed the original with fraudulent intent or the doctrine of spoliation of evidence otherwise applies." (Cal. Law Revision Com. com., West's Ann. Evid. Code (1998 ed.) foll. § 1521.)

Mother contends the circumstances presented to the juvenile court compelled a finding that it would be unfair to admit Officer Rodriguez's statements about the prison recordings. She insists the deletion of the video footage constituted spoliation of evidence because "prison authorities" apparently believed she had violated the Penal Code and thus should have known "litigation was 'reasonably foreseeable.' " Accordingly, mother argues these "authorities had a duty to preserve the security footage" and "their failure to do so resulted in spoliation of evidence," compelling a finding that "use of secondary evidence [would be] unfair."

The fundamental flaw in mother's argument is that the Department—*not* prison authorities—was the proponent of the secondary evidence at the adjudication hearing, and it is undisputed that the Department never had possession or control of the video footage. (Cf. *Victor Valley Union High School Dist. v. Superior Court* (2023) 91 Cal.App.5th 1121, 1138–1139 [spoliation occurs "when the *party in possession and/or control* of the electronically stored information was objectively aware the evidence was relevant to reasonably foreseeable future litigation" and fails to preserve it for another party's use (italics added)]; Cal. Law Revision Com. com., West's Ann. Evid. Code (1998 ed.) foll. § 1521 [exclusion may be warranted under the secondary evidence rule "if *the proponent* destroyed the original with

15

fraudulent intent or the doctrine of spoliation of evidence otherwise applies" (italics added)].) Thus, even if (as mother insists) prison authorities should have known the video footage would be relevant to a foreseeable dependency petition, this does not compel a finding that *the Department* engaged in spoliation. The Department requested the video footage from Officer Rodriguez, but was told it had been deleted and the only record of its contents was the officer's memorandum. On this record, the trial court did not abuse its discretion by declining to find that it would be unfair to admit the secondary evidence offered by the Department to support the petition's allegations. (Cf. *Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 864 [exclusion of testimony under secondary evidence rule was erroneous where it was undisputed that proponent did "not have possession or control of the original or a copy of the texts and that they were not reasonably procurable through the court's process or other available means"].)

As for the recorded phone conversations, mother emphasizes there is nothing in the record to suggest these recordings were deleted and the Department offered no explanation for its failure to produce the original recordings in lieu of or in addition to secondary evidence of their contents. We agree with mother that the better practice for the Department was to obtain the recordings and make them available for the court's review, especially after mother lodged objections challenging the introduction of secondary evidence under Evidence Code section 1521. Be that as it may, we cannot say the juvenile court acted arbitrarily or otherwise abused its discretion by admitting the evidence. The statute authorizes the admission of secondary evidence to prove the "content of a

16

writing" unless the court finds admitting the evidence would be unfair. (Evid. Code, § 1521, subd. (a)(2).) As we have discussed, independent evidence—including the date of mother's visits in relation to the recorded phone conversations—corroborated the authenticity of the recordings. This evidence also corroborated the accuracy of Officer Rodriguez's account, as did an interview with father's cellmate, who reported that father swallowed 10 bindles of methamphetamine (as suggested in one of the recorded phone conversations) and that he did so to provide financial support for mother and D.P. (as also suggested in some of the conversations). (See *ante*, fn. 4.) On this record, we conclude the juvenile court reasonably exercised its discretion to admit the secondary evidence.

4.      ***The Recordings Were Highly Probative of the Dependency Petition's Allegations***

Mother contends the juvenile court abused its discretion by overruling her objection under Evidence Code section 352. She argues the challenged secondary evidence was "substantially more prejudicial than probative" because, in her telling, Officer Rodriguez's description of the video footage "did not resemble" other evidence discussed in his memorandum. Specifically, she notes Officer Rodriguez described seeing D.P. on the video footage holding a chip bag with what appeared to be "bindles wrapped in a light-colored material" inside, while the officer's memorandum disclosed the bindles recovered from father's stomach consisted of "methamphetamine wrapped in blue nitrile gloves." Mother claims this purported inconsistency "demonstrates the lack of probative value inherent in Officer Rodriguez's statements," rendering this secondary evidence "substantially more prejudicial than probative." We disagree.

17

Evidence Code section 352 authorizes the trial court "in its discretion" to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490–491 (*Scott*).)

Mother's argument incorrectly equates credibility with probative value. The "probative value" of evidence, as the term is used in Evidence Code section 352, refers to its " ' "tendency in reason to prove or disprove any disputed fact." ' " (*People v. Rivera* (2011) 201 Cal.App.4th 353, 362.) In essence, probative value concerns whether and to what extent evidence is *relevant* to a factual issue in dispute. (See Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].) Credibility, although related, is a different concept that concerns the believability of a witness and whether the witness's testimony is true and accurate. (See, e.g., CALCRIM No. 226.)

The purported inconsistency between the "light-colored material" that Officer Rodriguez observed on the video footage

and the "blue nitrile gloves" that were recovered from father's stomach is probative of the *credibility* of the officer's account, but this supposed conflict does not render his account irrelevant or significantly diminish its probative value. (See, e.g., CALCRIM No. 226 [instructing how to assess conflicting evidence to judge witness credibility]; Evid. Code, § 210.) On the contrary, the officer's account was highly probative of the allegations in the dependency petition, as it spoke directly to—that is, it tended to prove or disprove—whether mother involved D.P. in a scheme to smuggle narcotics into the prison. As the finder of fact, the juvenile court, upon admission of the evidence, could decide whether any purported inconsistency or other credibility factor rendered Officer Rodriguez's account more or less accurate or believable. But the fact that this highly probative evidence might have the effect of undermining mother's denial of her involvement in the alleged scheme did not make the evidence unduly prejudicial. (See *Scott, supra,* 52 Cal.4th at pp. 490–491.)

Finally, we reject mother's contention that the juvenile court failed to weigh the relevant factors. When an objection is made under Evidence Code section 352, " 'the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value,' " but the "judge need not expressly weigh [these factors]—or even expressly state that [s]he has done so." (*People v. Mickey* (1991) 54 Cal.3d 612, 656.) Here, the record shows the juvenile court considered mother's contentions about prejudice and purported inconsistencies in their proper context, and the court recognized there were "some issues that [mother's counsel] has highlighted that maybe in a criminal court would lead to an argument that . . . the mother would not be found guilty." Given the judge's

19

frank assessment of the weight of the evidence in relation to the heightened standard of proof in a criminal case versus the preponderance of the evidence standard that applies in a dependency proceeding, we have no trouble inferring that the juvenile court properly weighed the relevant factors in admitting this highly probative evidence (even if she did not expressly state that she had done so).

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.